Case number 20-5240. Kevin Owen McCarthy, the Honorable, in his official capacity as House Minority Leader and member of the United States House of Representatives for the California 23rd Congressional District et al., at balance, versus Nancy Pelosi, the Honorable, in her official capacity as Speaker of the House of Representatives and member of the United States House of Representatives for the California 12th Congressional District et al., Mr. Cooper, for the police. Good morning, counsel. Good morning, Your Honor. Good to see you. Mr. Cooper, please begin when you're ready. Thank you very much, Mr. Chief Judge, and may it please the court, Charles Cooper, for the appellants before you who are the plaintiffs in the court below. The central issue in this case is a speech debate clause issue, and that question is whether the defendant house officers, in this case, are immune from this suit, the suit in which we are challenging their acts in executing and carrying out the proxy voting process established by House Resolution 965. We submit they are not immune from this suit, and the reason relates to this court's clearly drawn temporal distinction following Supreme Court precedent between legislative acts and things integral to the legislative process, which are immune, on the one hand, and acts taken in execution or carrying out such legislative acts which are not immune, and this court's case in Walker v. Jones articulated this temporal distinction very, very clearly. In that case, then Judge Ruth Bader Ginsburg wrote for Walker, for the court in Walker, that the Supreme Court has drawn a key distinction, she said, between acts that are legislative in nature and acts that, in her words, execute a legislative order or carry out a legislative direction. And Judge Ginsburg, then Judge Ginsburg, then explained the temporal quality of that distinction. This is what she said, and it's worth quoting her words in full, Your Honor. The Supreme Court has instructed that execution of a legislative decision is not cloaked with speech or debate immunity, for execution or carrying out legislative directions postdates what the clause protects, the process leading up to an issuance of the legislative direction. And so in that case, the legislative subcommittee deliberations and ultimate decision to fire the House food service manager, those were immune from challenge. Can I ask a question about this temporal dimension as you describe it? Yes. I understand the point, I think, where you have and then it's executed, and the execution itself doesn't have to do with legislating. What seems potentially different about this case is that you have a House rule and then it's executed, but the execution itself has to do with legislating, because the House rule is about how to vote. And so it seems different from the principle that you're identifying in Walker, because here the acts that are coming about that you're deeming executive acts are themselves intimately bound up in the process of legislating. And in fact, in Walker itself, for example, the opinion says activities integral to the legislative process may not be examined, but peripheral activities not closely connected to the business of legislating do not enjoy speech or debate shelter. And when I look at that phrase, I think that what we're talking about here seems integral to the legislative process, and it is closely connected to the business of legislating. Even though I take your temporal point, it's an execution of a House rule, but the execution itself has to do with the business of legislating. Well, Your Honor, I would suggest to you that that is not a dispositive or meaningful distinction in the court's distinction, again, between those things that lead up to a legislative directive, the things that are bound up with deliberations and what led to House Resolution 965, any more than, for example, in the Powell case, the activities that the congressional officers, in that case, the sergeant at arms, the doorkeeper, were ordered by a House resolution, Your Honor, to undertake, including barring from voting a member on the House floor. So there again, that act itself related directly to voting, voting, yes, for one member, but it still was bound up with the question of voting. The other thing I would say, Your Honor, on that point, is that it is certainly true that voting, as a general matter, is integral, of course, to the legislative process. Many cases have recognized that, and no one could deny it, but proxy voting is a different thing altogether. That can't be considered as integral to the legislative process, Your Honor, because it's never happened before. It's hardly plausible that something that's legislation in the legislative process, Your Honor, that Congress hasn't been kind of stumbling through its 231-year history, unable to use and never attempting to use some type of feature or tool that is integral to the deliberative process. And so to return to my central point, which concerns this temporal distinction, I want to emphasize that nothing in this case challenges any deliberation, any hearing, any subpoena, or any vote that led up to the enactment of 965. To the contrary, we seek only relief against congressional officers for their acts after passage of House Resolution 965 in executing and carrying it out. Now, the court below placed a controlling emphasis on the Consumer Union case, and I want to address that case because far from controlling in this circumstance, we respectfully submit, it is entirely distinguishable and distinguishable at three different levels. First, it is not a speech or debate clause case. It's a hybrid case in which this court held that the political question doctrine and the speech or debate clause operate together inextricably to require dismissal of the plaintiff's claim in that case, and claim that the plaintiff there, Consumer Union, had been unconstitutionally denied access to the press gallery. On that point, Mr. Cooper, we'll go back to the Walker opinion that you started off with. Walker describes, you're right, of course, that the opinion of Consumers Union invokes both modes of analysis, but Walker describes Consumers Union in terms of a speech or debate conclusion. I don't know that we in Walker looked back at Consumers Union and says it has nothing to do, we can't draw lessons about speech or debate because it was bound up with political question notions as well, because the way Walker describes Consumers Union is that it had to do with seating the press in the House and Senate galleries, and that was integral to legislative machinery, and thus were immune from judicial review by virtue of the speech or debate clause. A fair point, Your Honor. I would point out that in this court's decision in Barker, the court recognized the fact that the decision itself was bound up with political question and speech or debate, but, Your Honor, even if the court, despite the admonition by the Consumers Union court itself that it thought it would be improper to view either political question or speech or debate side of its analysis in isolation, if the court does view speech and debate in that still readily distinguishable, because that case, Your Honor, is not one that falls neatly in this temporal distinction that I previously outlined and that we've discussed, Mr. Chief Judge. It doesn't because in that case, and I should say before proceeding that our case does fall neatly within that distinction, and for that reason and that reason alone, we prevail under the speech or debate clause, but, Your Honor, the reason that it doesn't fall neatly within that temporal distinction is the third basis for distinguishing that case, and the court emphasized in Consumers Union that the process by the Periodicals Association in that case of policing press access to the House chamber took place on an ongoing day-in, day-out basis, as the court put it, in the regular course of the legislative process, and so in that regard, what that association was doing on a day-in, day-out basis was much the same as what the House chaplain does essentially every day as it opens legislative sessions, which was that issue before this court in the Barker case, and so the question simply boiled down to, in both the Barker case with the legislative chaplain and in Consumers Union with respect to the association, whether or not there was a temporal part of Consumers Union, because Consumers Union in some ways could be described as parallel to this one in that that also involved rules, and then the particular case involved a particular implementation of the rules after the rule was adopted, and that's the way you describe this case, too. Now, one thing you could say potentially is, yeah, but that happened fairly regularly, so every time you were implementing the rule, you were also kind of carrying on this daily interaction with the rule, whereas here, you could argue that it's more sporadic, but then when a vote is taken that involves, if more than one vote is taken that involves proxy votes, then you're necessarily in this in-between period where you're anticipating another proxy vote coming along later also. Your Honor, you're making a very fair point, and I think that the Walker case does indeed understand what was happening in Consumers Union as not falling in to this temporal distinction that the court emphasized in that case, because if it had viewed it that way, it would have had a very hard time not understanding what the Periodicals Association was doing as not executing congressional orders, so it did view, as I think the court has just suggested, and the ongoing regular day-in, day-out process, as I say, analogous to the chaplain, the House chaplain in the Barker case, as outside of this execution versus legislative act dichotomy. Walker did say in reference to Consumers Union that Consumers Union immediately concerned House consideration of proposed legislation, and so it's looking at the effect of the press gallery rule in the context of the legislation that's being considered while the folks are being seated, right? And so, in a way, it's talking, the parallel, you would say, is, well, by parity of reasoning here, the House rule has to do with the tabulation of votes in connection with a proposed legislation that's yet to come to pass. Well, that's right, Your Honor, but if I'm completely following the court's point, but, Your Honor, I would direct the court's attention to how then-Judge Ginsburg framed Consumers Union and why it was intricately involved in the legislative process. The court said that it involved regulation of the very atmosphere in which lawmaking deliberations occur. Your Honor, that point in and of itself sprang from the reality that the delegated responsibility for the Periodical Association was to protect legislators themselves in the chamber from the harassment of news reporters, actually, those masquerading as news reporters, who were actually lobbying and otherwise importuning the legislatures. So, the very atmosphere of the legislative process was at stake in that case. That is integral. The court, Your Honor, for example, again, in Barker, the legislative prayer opening every session, Your Honor, is not, and so, therefore, is not protected by a speech or debate. Here, again, I would reiterate that the actions taken by the congressional officers in this case can't be viewed, we would submit respectfully, as integral to the legislative process, because proxy voting itself can't be viewed that way. It is, as I mentioned earlier, it's unprecedented, and, Your Honor, something that has never happened in 231 years, it seems to us very difficult to say is integral to a deliberative process and a legislative process that has worked well for it. I mean, that does get in, in some measure, to the merits of whether proxy voting is or isn't something that falls within the compass of something that the House has permitted to allow, and can I ask you, shift, Peter, for just one second and ask you one question about standing, although I don't want to take my colleagues away from speech or debate if they have some questions on that, but I have a standing question for you, and I know that the district court didn't ultimately rule on standing, but the issue was before, and both sides have briefed it amply in our court. Is your theory of standing, does it mean that anytime it's easier for someone else to cast a vote, then there's injury for the person, the legislator who's bringing the claim? Because I'm not saying that's necessarily wrong, but it seems to me that's effectively your theory, because your idea is our no votes would carry more weight if somebody who had a yes vote couldn't vote, and so something that makes it a little more difficult for that person to vote, say, harder to show up to vote, you know, anything that makes it easier for someone else to cast a vote seems like it potentially imposes an injury on somebody else who's casting a vote. Your Honor, that is not our claim. Our claim is simply that if you assume, as you must, for purposes of standing, that proxy votes, if they are invalid, that counting an invalid vote, an invalid vote, not a vote that never showed up and got cast because it was difficult logistically for that member of Congress or whatever, or that citizen to get to the polls, but rather if, as a matter of constitutional law, the vote itself is a nullity. It's not constitutional for it to be cast, which we are submitting is the case with proxy votes, then counting that vote anyway, that is what creates the dilution and the constitutional injury. I don't believe it would be, and I'll be honest, I hadn't thought through the point the court is votes that are, as a constitutional matter, or a legal matter, illegal, and votes that are simply difficult. In our case, and the only case before you, is that the counting invalid proxy votes dilutes the votes of all the valid votes, all of them that are cast, and that creates the injury recognized by this court in Michael. I don't think I understand why invalidity, I'm not necessarily saying that this means your standing theory is wrong. I'm just trying to understand the implications of it. I'm not understanding why invalidity of a vote gives rise to a different injury in kind than any time it's easier for someone else to vote, because the injury comes from the fact, as I understand it, the injury comes from the fact that the legislator who's bringing the claim would have gotten a result on the vote, but for the fact that somebody else cast a vote that ended up annulling, like happened in Cooper. It's that kind of injury that we would have won, except that somebody else got to vote who shouldn't have gotten to vote, or who cast an invalid vote, or whatever it is, but because they got to vote, the result that I wanted did not come to pass, and that's the theory of injury as I understand it, and that would encompass, that's not the theory of injury. No, your honor, that is an injury, that's the ultimate injury, from the counting of an invalid vote, or from the non-counting, if you will, of a vote that just couldn't get to the poll, if you will. That's the ultimate injury, but your honor, the injury that is before you now, is that the very casting of a vote dilutes everyone else's vote, if that vote is invalid, and it doesn't count, even if that vote, that invalid vote that was cast, and counted, was not decisive. Now, there have been many decisive proxy votes in the context of yielding an actual law yet, but decisive in many other respects, including how the house organizes itself, and the kind of powers and responsibilities that individual members have, but your honor, we would say that the injury, and the injury, we believe the discord in Michael, and before it, and Vanderjagt recognized, is the injury that flows just from the casting and counting of an invalid vote, and I think that this court's decision in Skaggs against Carl actually acknowledges that is the injury, regardless of whether the vote itself was decisive. Now, it's certainly true, and I'll subside in the hope that I have a little rebuttal time. We'll give you a little rebuttal time, we will. Thank you, but well, in that case, your honor, I think I've completed my point. I do want to, please Judge Rogers. One sort of basic question. The theory here, as I understand it, is basically a geographical notion that because in history you had to be on the floor as a duly elected member in order to cast a vote, any change as to that geographical aspect is necessarily, I'm trying to put your words, not mine, a vote that cannot be counted, and you cite a number of authorities. I'm wondering though, over history, you know, originally everybody had to ride a horse, so only certain people who had a horse could get there, and snow or whatever might prevent that person from arriving. Then we got airplanes, we got trains, so a lot more people were able to get there than at the time of the founding. I'm wondering about this notion of 203 years, what the framers had in mind in terms of making certain that voters were duly represented in the halls of Congress, and your answer seems to be only if their feet are on the soil of the floor of one of the houses. Yes, Your Honor. We think there's two very important supports for our argument that actual presence in the House or Senate chamber is necessary for an individual member to be counted towards a quorum or to cast a recorded vote. One is the language of the Constitution itself, and yes, it was written at a time when it was much, much more difficult, of course, to attend the sessions, but nonetheless, it was a time when proxy voting was well known and was practiced in legislatures before the framing of the Constitution, but nonetheless, the framers, in one passage after another, from Article I, as we say, to the 23rd Amendment, used words that make just as elusively clear that actual presence was required for these purposes, Your Honor, and our point about history is simply that unbroken history for 230-plus years, the House has, up until recently, and the Senate even still, has obeyed the clear, what we would submit to Judge Rogers as command of the Constitution's provisions, that actual presence is necessary to cast a valid vote or to be counted towards the quorum. And yes, it is geographical in a sense, as you're suggesting. It's geographical in that, yes, the individual member has to be present. That's why, in the history of this Congress, we've had members, even essentially on their deathbeds, rolled into the chamber in order to cast a vote. Yes, I thought of that too. But I'm trying to understand the word presence and what exactly that means because, again, as the Chief Judge points out, getting a little into the merits here, the quorum requirement and the fact that there is a quorum at 12 noon doesn't mean there has to be an actual quorum, physical presence, at 3 p.m. when the vote is taken. That's the way the chambers have operated under their rules. And the fact that proxy voting existed and Congress, the House, chose not to use it doesn't necessarily decide the question. That's what I'm trying to understand. You know, they use ten and quills. Well, we don't use that anymore. So there is some movement here. And I want to it's, as they say, boots on the ground is what you're saying the founders required. Yes, Your Honor. And to address the point about a quorum, the, I think, historical judgment from the Federalist Papers concerning why they chose to set it at a majority is further supportive of the proposition that actual boots on the ground, Judge Rogers, as you phrase it, was the understanding, the command of the Constitution, because there was a debate over what the quorum requirement should be. And a majority was relative difficulties that individual members of the body would have to negotiate in order to be present and not be absent, so that they could be counted towards a quorum further with respect to the quorum point. Yes, Your Honor, it is true that if a quorum is established at noon on a legislative day, it doesn't mean that an actual, it must be established first by actual presence. There's simply no debate or dispute among the parties on that. And any time any member suggests the absence of a quorum, it must be again established by actual presence. But it is true that once it is established, a presumption attaches. And the quorum is presumed to persist until such time as any member suggests to the contrary and requires that the actual presence of a quorum, as the framing goes, has to be once again demonstrated. But, Your Honor, we would simply note that the practice of unanimous consent is one that is common to legislatures long before it was adopted by the bodies of our Congress as a necessary presumption and a method by which legislative bodies can proceed without constantly, constantly counting noses to determine and to establish and to prove that yes, a quorum continues to exist. So under your theory, and I won't persist, but just under your theory, if you view COVID as a plague, Congress could not operate? Your Honor, no. We believe that Congress has operated throughout history, even in the presence of plagues that are worse by orders of magnitude, at least as we speak, than the coronavirus crisis. Take my hypothetical. I'm just trying to push you here so I know how far your theory goes. There is a plague and hope I can convene in a geographic sense. I think that constitutional systems, as I understand your argument, Congress simply could not function because no one geographically could get to the floor of the House. Your Honor, that scenario, that hypothetical, Your Honor, I believe, would result in Congress having to find some way to gather in person, as it has in every crisis that it has faced throughout American history. My hypothetical is we have a new crisis. We haven't ever experienced this in the past. And there really isn't any disagreement in my hypothetical that the plague is such that the House and Senate have to shut down under your theory. I just want to understand, under my hypothetical, and you're saying COVID is not such a situation. And I'll take that as a hypothetical. Is that the result of your theory here? Your Honor, I have to give you the same answer that plague. And it was that, in Jefferson's words, even if the Congress has to meet in Philadelphia, the seat of government, in a field for one day before it moves its place of convening to a safer location, then that's what it must do. Of course, his words have to be taken in context. It is not Zoom and other things at that point. I won't belabor this. Judge Walker has some questions. Well, before my questions, I do want to follow up on, if I can try to give the answer to Judge Rogers' hypothetical. Assume that if anyone leaves their house, they will die. Assume that's the hypothetical. And my question is, does that mean that Congress simply cannot meet, according to your theory? According to my theory, Your Honor, I believe that the Constitution will have to be amended to permit them to meet. And the Constitution can't be amended unless two houses of Congress support the amendment with the supermajority. And if they can't meet, they can't do that, right? And that may be a very good reason for Congress and the country to consider such an amendment in a time when it can take place. Fair enough. One last question on the merits before I want to go back to standing. The Supreme Court recently said in its Wayfair decision that one may be present in a meaningful way without that presence being physical in the traditional sense of the term. What do you think about that? Your Honor, I think that statement was made in a very different context. It was made in the presence of a corporation, and in particular, a retail corporation that has retail sales, even if it doesn't have an individual or an office present in a particular location. And a corporation can have many different places of presence. It can even have, and the Court has struggled with how to identify a single place where a corporation is present, I think, ultimately settling on the center of gravity rule. But a person... Mr. Cooper, let me interrupt, if I may. Do you think that I'm present for this oral argument? Your Honor, you, I think, yes, I think you're present in the sense that we are interfacing together through this medium. But, Your Honor, if you, if your law clerk were sitting in your chair and were asking me questions by your proxy, you would not be present. So you'd be fine with a House rule that allows voting by Zoom, correct? Your Honor, I think that would fall under my same argument. It would be a different case. It would be a different case. There's no way to say that you're present if what's present is your proxy. I wasn't even going to ask about merits, but Judge Rogers got me all interested. So if I could ask one or two quickstanding questions and then I'll get out of the way here. You don't represent the House of Congress. You don't represent even an entire committee of Congress. Your clients are, I believe, all members of Congress from one political party. I guess it seems to me that this is yet another case where one group of politicians are sparring with another group of politicians and they want the federal court to pick a side. Whether we view this under standing jurisprudence, political question jurisprudence, speech and debate jurisprudence, the principle behind those doctrines is that this court, no court, is supposed to be an instrument of partisan warfare. Tell me why I shouldn't view this case as a group of Republican representatives trying to get their way in Congress against a group of Democratic representatives. Your Honor, just to put this in the context of standing, I think you're bound by the Michael case. And that case, Justice Shirley, had its territorial representatives were allowed to vote in the committee of the whole. It was the partisan objection. I understand, Michael, and would I be interpreting your answer correctly if I interpreted you to be saying Michael says it's okay for one segment of politicians to use a federal court as an instrument of partisan warfare against another group of politicians? No, Your Honor, that is not any way close. I don't think that's what I don't think that's what Michael says either. So I'm wondering how and I don't know my argument. How is that what's not going on here? Well, Your Honor, what's going on here is one set of members of Congress are saying that they are being injured by a different set of value of their vote being compromised. And Your Honor, whether that breaks down, if I'm right, and that is happening, whether that has broken down on a partisan basis, as one would probably expect that it might, should not stay the court's hand from, if we had standing, if the case is not barred by speech and debate, should not stay the court's hand from from a courting, from taking it up and according a remedy. This court... Very good, Mr. Cooper. And that assumes that that Michael survives, reigns. And that's that question is well briefed by both sides. One last standing question. One of your clients is a named, I think his name is a Mr. Swayze. He's in a congressional district whose member of Congress did vote by proxy. So why does he have standing? How has he been injured by this rule? Your Honor, our theory there is he's been injured because his representation in Congress has been sub delegated. Our point is that Mr. Swayze and the other citizens, voters in that district have delegated their power through the representative that they elected to express their voice in the halls of the House of Representatives. So then Mr. Cooper, that means that everyone, every constituent and every district in the which now starts to look a lot like a taxpayer standing case, which means no standing. Your Honor, I want to call the court's attention to the Michael decision again, where the court addressed the widespread nature of the injury that was before it, the claimed injury before it from dilution of the voting power of members of Congress. It, it attached to every member of Congress and therefore it attached to all their constituents. Very good. Very good. Thank you. Thank you very much. Thank you. Thank you, Mr. Cooper. Unless my colleagues have further questions, we'll, we'll hear from Mr. Letterman. We'll give you some time for rebuttal. Thank you, Mr. Chief I'm Douglas Letterman, the General Counsel of the United States House of Representatives. Before I start, please just give me a moment to say that it is such an honor and pleasure to appear in court with my friend, Mr. Cooper, with whom I've been friendly for several decades. Your Honor, I had a lovely stirring introduction, which I'm going to pass because I want to jump right in and answer the questions that you have asked. If you want later, I can email you the, that wonderful introduction. The, the first point right off is to get to some of the questions from the, the, the Chief Judge. First, remember, Bailin has a very, not, not Bailin, Rangel has a very key quote. The, there this court said, Congress's execution of internal rules is legislative. And so, as you know, and as the, the, the decision in, in Walker focuses on is, is it an act legislative? And as, as this court has said any number of times, it doesn't matter who the actor is, it's the act. And so the Walker decision says quite a few things as, as my friend, Mr. Cooper has mentioned, but just above even the, the point that the, that the Chief Judge quoted at some point, the, the court said consumer's union held that arrangements for seating the press in the House and Senate galleries were integral to the legislative machinery. And thus we're immune from judicial review by virtue of the speech or debate clause. So here, as Judge Contreras found, it's harder to think of something that is more integral to the legislative machinery than the act of voting. And remember, that's what this case is about. Congress, the House has made a rule, an internal rule about how members can vote. And so again, as Judge Contreras found, this is as close to the legislative process as you can get. Mr. Cooper says that consumer's union is, is, is not directly on point here because it did delve into other rationales. And it's again, the Chief Judge's question that, and I just wanted to note at page 1348, the, this court said that it was looking at whether constitutional rights and therefore a question proper for considering such a formulation in the abstract, but turned to the effect of the speech or debate clause to settle whether despite the claim of constitutional violation, tenuous as we have noted or otherwise, this case is, is yet non-justiciable. So I think that that makes clear that that is holding of consumer's union. And that was indeed picked up then in the, the later decisions such as Rangel. Can I ask you, Mr. Lutter, what's your, what did you do with Powell versus McCormick? Yes, Your Honor. So obviously in some of these cases, it is, it is difficult to draw the line. But in Powell, the Supreme Court drew the line at the, there, the, as I recall, the, the doorkeeper and maybe the Sergeant-at-Arms, it said they can be sued. Under the circumstances there were, remember, Representative, the, the court had, the House had said they were not going to seat Representative Powell. So he was not allowed to vote or participate or receive a salary in any way. And under those circumstances where he had been kicked out of Congress, that then was considered close enough that speech or debate did not bar a suit against those officers. Does it come out differently? Does it come out differently if they let Powell do everything a member of Congress does, except they just don't count his vote? So you mean you have a situation where Congress decides that the House decides it is not going to count any specific representative's vote? That very well might come out differently. The, the situation, it would be an individual, a situation of, of individual discrimination against an individual. It's possible. But I'll- Really, Mr. Levitt, is that really the position of, of your clients that the majority of the House could single out a single member of the House and say, we will pay you, we will listen to you, we will let you have an office and the staff will let you walk around and come on the House floor, but we will not count your vote. And you have no way, you have no remedy in a court. Well, again, if, if the, if Powell is controlling, then, then that suit would be cognizable. However, remember that the speech or debate clause was inserted into the Constitution by the framers. Mr. Lerner, I, I, I wanted to give you a chance to say what you were about to say, but first, if you could, if you'd give me the answer to my question, it's, it's not the same facts as Powell under the facts I gave you. Would, would the new Powell, the new representative Powell be able to get a remedy from a court? And, and you know, Your Honor, the first words out of my mouth in response are going to be, that's not this case. The, if there is individualized discrimination against particular members of Congress, that would pose a very difficult case and a very different case. However, as I was starting to point out, remember that speech or debate is absolute. So for example, this court, the judges on this court have absolute immunity. It doesn't matter if I say, but you discriminated against me on the basis of my race. That is my claim. I am, that is exactly my claim. And you all can say, that sounds good. And you may even be right, but we are absolutely immune. So I take that. And if I'm understanding your answer and my hypothetical would be a different case, of course. And you're not taking a firm yes or no on whether or not a court could decide that case. But I think I hear you saying a court probably could not provide a remedy to the Powell in my hypothetical. Except the, the remedy, remember that there would be very likely a remedy for a plaintiff who came forward, who was affected by a law. If there were a law passed and individual members of Congress were discriminated against, then very likely people who were affected by that law, they could sue and they wouldn't sue the members of Congress. Remember they would then be suing the executive branch, which would be carrying out the law. So there is a remedy. Okay. Your honor, even with the individual who brings a suit, if it's a speech, that's true for standing, that's always a way around potentially around standing. Cause that's what happened with, with Reince and Clinton and Clinton versus New York. But does that work for future debate purposes? Because if the individual is suing, they, the individual action would be brought against who? The Sergeant at Arms? The question, the hypothetical that I was posing your honor is Congress. Let's say the house says we're not going to count any votes by women. Women shouldn't be here. We're not going to count their votes. And then the house passes a statute, passes a law. It turns, it comes into law. Somebody who is then affected by that statute could say that statute was unconstitutionally passed and they would presumably be suing the executive branch, which would be enforcing the statute against them. So that was the, that was the, the, the, the remedy that I was posing. Okay. So then can I just go back to Powell for a second? So then if, if we assume that the answer to Powell, the hypo that Judge Walker posed to you, if we assume that the answer to that is no, speech or debate is absolute as you described it. And therefore in a situation in which the remaining members of the house decided that Powell was not going to be able to vote, but he could sit. And then that's the, you can't bring that action because speech or debate would prevent a remedy there. Then what's the difference between what, because Powell did allow the suit. So the difference is that you can't be excluded altogether, but you can be excluded from voting for speech or debate purposes. And if you're excluded altogether, there's no speech or debate problem. If you're excluded from voting that there is. Your Honor, what I was saying in Powell, the court, the Supreme Court obviously believed that the combination of circumstances made it so that it drew a fine line. And it said under those circumstances where the member is being excluded and not paid, remember, that was a key part of the decision and not paid, that person can't sue. This case, and so if the facts of that case change, would the Supreme Court come out differently? I don't know the answer to that. And here's what Gravel says about Powell. Powell v. McCormick reasserted judicial power to determine the validity of legislative actions impinging on individual rights. And it seems like one thing that Gravel was doing is it's taking the three cases that have been discussed in the briefing, Powell and Dombrowski and Kilbourn. And at least in some measure, there's a lot going on in Gravel, but at least in some measure, there's a reference made to impingement on individual rights. Usually third parties, Powell's a little different because it's hard to call Powell a complete third party, but what was at stake was individual rights and according to the Supreme Court. And so is the theory behind the potential distinction between exclusion altogether and exclusion as to voting, that insofar as you're excluded altogether, that impinges on individual rights, insofar as you're excluded where you're included, but you're excluded for purposes of voting, then it transfers the case from one about individual rights to one about rights as a legislator. And this is some theory that helps draw the distinction as opposed to the factual distinction. Right, Your Honor. And so that would be a potential theory. It may very well be, as the Supreme Court said in Gravel, my memory is saying that's a potential point and that is. And so there would be, if under those circumstances, the House chose to assert speech or debate, obviously it would be a very difficult case to determine. This case, again, there's no discrimination against anybody. Remember that this method of voting has been made available to all members of the House. So wherever we draw the line, this case is nowhere close to it because it is quite different since there is no individualized discrimination. Can I take you to standing for a second unless I don't want to move off speech or debate too quickly? Yes. My colleagues have questions on that. Then let me take you to standing for just one second. So let's assume, I know you'll resist the assumption, but I'm just asking you to assume it. Assume that we think Michael is still good post-Reins. And I know you've got your argument that says Michael should be rethought after Reins, but let's assume that Michael's still good. If the rule in Michael were that not only do the representatives of the territories, not only are they allowed to vote, but in order for them to vote, they have to vote by proxy. And then somebody, another legislator challenges the ability of them to vote in the way that Michael came about. Then under your standing theory, would it be that insofar as they're challenging the ability of the territorial representatives to vote altogether, they're standing. Insofar as they're challenging their ability to vote by proxy, there's no standing. So the first answer on Michael, and I hope I'm responding to your question, is Michael is obviously different because Michael adds more people to the denominator. It says people who we say cannot vote, they get added. Right. But I'm saying that they can vote, but they have to vote by proxy. Right. So then that makes it quite different, Your Honor, because then you're talking about, is this court going to review rules set by Congress on how to vote? Now, it still might be a question of, there might be standing there if there is individualized discrimination against some members. And as you know, the footnote in Reigns leaves that open. And so it may very well be that that would be enough to bring standing. So if Michael is still good law, if you start adding people to the voters, Michael would mean that there is standing for that. If you individually discriminate, Reigns says that might allow- I guess I'm trying to tease out the following point to me, which seems like a question raised by your standing theory, which is that I know you've got this denominator notion, that if you add to the denominator, then they're standing. But if the denominator stays the same, then there's not standing because the people who are complaining still got their one 435th. But in a case in which somebody's not supposed to vote, but then they're allowed to vote by proxy, it seems to bring both of those together. Because the person who's complaining, they're just saying, look, that other person shouldn't have gotten to vote. They shouldn't have gotten to cast this vote. And you could say it in one or two ways. You could say, A, they shouldn't have been allowed to cast a vote at all because they're ineligible to vote. And then you could say, B, well, regardless of whether they were eligible or not, they cast an invalid vote. Still, that vote shouldn't be counted. And it seems to me your standing theory tries to draw a talismanic distinction between those two modes of argument. And I'm not sure I understand the talismanic distinction when you're talking about injury, because the person who's complaining about the vote is still being injured in the same way, that somebody else whose vote shouldn't have counted got to be counted. Your Honor, I think a more appropriate way to look at it, when I say more appropriate, I mean under the case law, is you don't have standing to challenge how somebody else who can vote does vote. For example, suppose there were, and I think this hypothetical is directly on point, and it ties in with one of the questions that either you or one of the other judges asked. Suppose the election board in a state says, there is a blizzard coming, so we're going to open the polls an hour earlier and keep them open an hour later. Under Mr. Cooper's theory, and I believe I heard him indicate this, he would say, well, but that vote under the prior rule would not have been valid. If you vote an hour after the polls close, your vote doesn't count. But the Board of Elections says we're going to keep open an hour later. Could anybody sue, would anybody have standing to say, I'm planning to vote in the middle of the day, how dare you make the polls open an hour longer so that registered voters have, it's easier for them to vote? If the old rule applied, their vote would be invalid. Well, nobody would think that they're standing in that circumstance. So it's not a question of, like in Michael, where you're saying we're going to take some people who under your claim are not eligible to vote, they can't vote, whether they vote by proxy or by time, whenever. That's quite different from simply saying we're going to make it easier, we're going to make the democratic process easier for people to vote, people who are otherwise completely eligible to vote. So I think that's a very clear distinction. I understand the distinction. I guess it's not immediately apparent to me how much work that distinction does vis-a-vis the person who's injured. Because it just seems to me they're injured in what could be described as the same way, which is that their affirmative vote isn't getting the same mileage because some other vote was counted that shouldn't have been. Let me try this way. I'm sorry. I'm sorry. No, that's all right. You go. Let's put it this way. We don't believe that they are injured. And again, I think the case law supports this because this opportunity is open to everybody, all the eligible voters. We're saying, okay, everybody who is eligible to vote, we're not making more people eligible. We're not giving you an additional opportunity or ability to exercise your vote. That's very different. And I don't think, and I'm fairly sure... It just seems like it's semantic because in some ways you are making more people eligible to vote because a predicate to casting a proxy vote is that the person has to say that they couldn't have been there. Right. And it says they're unable to vote. Now, remember, Your Honor, the person could say, this is a really important vote coming up. If I travel to Washington and go on to a crowded House floor, I might get sick and I might die, but I'm going to do it because you left me no choice. Now, I think that person is unable to vote in the way that we in the House, we understand the proxy voting. So you could say, yes, fine. If there's no proxy voting, remote voting, I'll get there and you watch me die. Does that mean that that then changes things? So if what you're saying is what I think Mr. Lyons are saying is we insist and that the framers insisted that everybody can only vote in one way. And that is even if it makes them vulnerable to death from a raging pandemic, that's it. That's what the framers meant. In addition, if I could add one more point, Your Honor, I know you didn't ask specifically about this, but I think it ties in very well. Remember what we're arguing is Michael is distinguishable. And I know your hypothetical said, okay, suppose that Michael is not overturned by Reins. But remember what Mr. Cooper is doing here is he is asking you to extend Michael to a different situation. And even if Reins did not expressly overrule Michael, surely it would be very strange for this court after Reins to extend Michael to a new factual situation. Let's see if my colleagues have any further questions for you, Mr. Leiter. Okay. Thank you, Mr. Leiter. I think we have your submission. If you have something else you want to say in closing, you're welcome to, otherwise we'll let Mr. Cooper have his rebuttal. Would you give me one second to just very quickly scan my notes because I did jot down several things I was going to say. Oh, do you mind, Your Honor, the one thing I wanted to do was the questions about, well, no, I guess, nevermind. Your Honor, I'm sorry. I rest. Okay. Okay. Thank you, Mr. Leiter. Mr. Cooper, we'll give you, I think it was three minutes of rebuttal. Thank you very much, Your Honor. Mr. Cooper, could I ask you to start and then there'll be time for you to go from there, but assume that Michael was overruled by Reins. What's your best argument for standing in that case? Assume I think it was overruled. How can I still rule for you on the standing question? If it was overruled by Reins, despite this court's many, many statements to the contrary, including Judge Rogers' recent opinion for the in-bank court in McGann, Your Honor, I would simply be, I would simply argue to you that the dilution, I would argue Reynolds against Sims, Your Honor. I'd argue Westbury against Sanders. I'd argue the census cases. Any time a valid vote is cast and is essentially canceled out by an invalid vote, there has been an injury in fact. And Your Honor, that is mathematically inescapable. And so that would be my argument to you, Your Honor. I'm not sure I'd have a case other than the classic dilution cases to offer you. Certainly if Reins has overruled Michael, my job is a whole lot harder. And I don't want you to have to spend your whole rebuttal answering my question, so I'm good if the other judges are. Let me speak to the Rangel case mentioned by Mr. Letter. What he's quoting there is a parenthetical after the citation of Consumers Union. And the parenthetical says, Congress's execution of internal rules is legislated. Well, that parenthetical from Rangel simply can't be squared with the case that it cites, Consumer Union. It is a drive-by comment and the court can't place a stock at it, even if it could because Consumers Union recognizes this temporal distinction. But even if it could, it would be refuted by the Powell case, which also was the execution of internal rules, internal rules relating to the discipline of a member of Congress, just as Rangel was. Secondly, Judge Walker, your hypothetical. I think I heard my old friend, Mr. Letter, basically say that, yes, there'd be no standing if Mr. Powell had been stripped of nothing other than his right to vote. I think I may have also heard him stand up to the hypothetical that I've you have a rule passed where women cannot vote. And he makes the point that it's absolute. Your Honor, I don't think that his points can stand up to that hypothetical. And it wouldn't change one bit, Judge Walker, if that decision to strip Mr. Powell of his vote was an act of partisan spite. It wouldn't matter. I see my three minutes has already fled by, Your Honor. So I'll thank the court for its time and attention. Thank you. Thank you, counsel. Thank you to both counsel for your arguments this morning. We'll take this case under submission. Thank you very much.
judges: Srinivasan, Rogers, Walker